Relevant
FACTS

PAGES
20 - 45

19



WIKIPEDIA
The Free Encyclopedia

# United States Digital Service

The **United States Digital Service** (USDS) was a technology unit[1][2] housed within the Executive Office of the President of the United States.

The USDS was launched on August 11, 2014 by president Barack Obama. It provided consultation services to federal agencies on information technology. Its mandate was to improve and simplify digital service, and to improve federal websites.[3][4][5][6]

President Donald Trump issued an executive order on January 20, 2025, repurposing the acronym as the **United States DOGE Service**, with an emphasis on rooting out DEI initiatives, drastically cutting entire offices of the Federal government including food health and safety oversight, public health, international aid, corruption oversight, whistleblower protections, and fiscal governance, in the name of reducing waste. In order to carry out this mandate, the order established a temporary quasi-governmental organization of questionable legality within USDS, called the U.S. DOGE Service Temporary Organization (USDSTO).[7][8]

| United States Digital Service | |
|---|---|
| **Agency overview** | |
| **Formed** | August 11, 2014 |
| **Headquarters** | 736 Jackson Place, Washington, D.C., United States 38.899614°N 77.038026°W |
| **Parent department** | Executive Office of the President of the United States |
| **Child agency** | U.S. DOGE Service Temporary Organization |
| **Website** | www.usds.gov (https://www.usds.gov) |

# History

## Background

For years, people both inside and outside of government were working on ways to make government more effective, using technology and design. This included the Consumer Financial Protection Bureau, Code for America, Government Digital Service in the U.K., and

other U.S. government entities.

The idea took more concrete shape when Jennifer Pahlka, having visited the United Kingdom's Government Digital Service,[9] joined the Chief Technology Office of the United States and converged her ideas and with what was already underway in the United States Government. The HealthCare.gov technology crisis accelerated the idea and served as the United States Digital Service's first project.

## U.S. Digital Service

The U.S. Digital Service was initially established by President Barack Obama on August 11, 2014, to improve and simplify digital service, and to improve federal websites.[10][11][5][6] The first head of the USDS was Mikey Dickerson, a former Google engineer who had previously been involved in the 2013–14 rescue of the HealthCare.gov website.[12] He was succeeded by Matt Cutts, who held the position until April 2021.[13]

The third administrator of the USDS was Mina Hsiang.[14][15][16] During the Biden administration, Hsiang led the USDS in deploying a new website about COVID-19 vaccines. [17]

By 2021, the USDS employed 215 people and was looking to expand further.[18]

The USDS has created:

- A Digital Services Playbook, for improving digital government[19]
- Draft Web Design Standards, "to build accessible, mobile-friendly government websites" [20]
- TechFAR Handbook, 2015[21] on federal contracting and procurement[22][23]
- Discovery Sprint Guide, 2021[24]

The USDS sends an annual report to Congress detailing projects and accomplishments.[25] Its federal agency work spans across the Department of Veterans' Affairs, Department of Defense, Small Business Administration, General Services Administration, Department of Homeland Security, Department of Education, and Department of Health and Human Services.

## Accomplishments as the USDS

- For Health and Human Services COVID-19 vaccine finder tools were created. Which included two websites, a chatbot, and a multilingual call center. These helped people find life saving vaccines. With over 184 million visitors to Vaccines.gov and Vacunas.gov.

21

These websites were operated by the Centers for Disease Control and Prevention.

- The USDS modernized the way the U.S. government buys technology. A program was launched that trains contracting officers on best practices and how to purchase modern technology, which helps projects be delivered on time, under budget, and designed with the end user in mind. 400 people graduated from the Digital IT Acquisition Professional Training Program by the end of FY 2020. 9 agencies received better contracts due to these courses. The USDS also helped educate families about the earned income tax credit and child tax credit via ChildTaxCredit.gov, which over 41,000 users used as tool to find free tax filing services and receive expanded tax benefits. This encouraged families to file a tax return and contributed to a 25% reduction in food insecurity among low-income families. The USDS also helped change the way technical talent is hired by the government. A new hiring process was championed that used fair and open access for all applicants, while shortening the hiring timeline, and ensuring those hired were qualified.
- The USDS and the Office of the Chief Technology Officer together built the new VA.gov website for the Veterans Affairs, which was built with the input over 5,000 veteran, service members, and family members. Customer satisfactions for using the VA.gov website rose on average from 53 to 69%, the website at one time had over 1.7 million logins per month.
- Homeland Security worked with the USDS to build a digital system to allow immigrants to apply and track applications online, and process them digitally. This led to 100% of naturalization applications being processed electronically.[26][27]

Other Digital Services were created and modeled after the United States Digital Service:

- Florida Digital Service, created in 2020[28]
- Colorado Digital Service, 2019[29]


## U.S. DOGE Service

On January 20, 2025, President Trump issued a executive order renaming the United States Digital Service as the United States DOGE Service, where DOGE stands for Department of Government Efficiency. The order established an organization within USDS, called the U.S. DOGE Service Temporary Organization (USDSTO), and tasked it with "advancing the President's 18-month DOGE agenda". The order requires every agency to create a DOGE team of at least four employees in consultation with USDS to implement the president's DOGE agenda.[7]

Trump initially announced that DOGE would be co-led by Elon Musk and Vivek Ramaswamy, though Ramaswamy stepped away from the project before it began, in order to prepare for running for governor in Ohio.[30] As of February 2025, Musk has not stepped

*22.*

aside from his private business roles as owner of X Corp. and CEO of Tesla, Inc. and SpaceX. [31] Musk has been designated a Special Government employee and numerous outlets have described DOGE as a Musk-led initiative.[32][33][34][35]

## Legality

The legality of DOGE is unsettled. The nonpartisan Congressional Research Service identified several legal issues, including whether and how Congress will fund appropriations for DOGE, whether legacy USDS projects already funded by Congress will be continued, and whether DOGE is or will be subject to federal transparency laws (Freedom of Information Act and Federal Advisory Committee Act), records laws (Privacy Act of 1974), and ethics and conflict-of-interest laws (Ethics in Government Act).[36]

By January 21, 2025, three lawsuits had been filed in the United States District Court for the District of Columbia that alleged that DOGE is an advisory committee and violates the Federal Advisory Committee Act.[37]

## Conflicts with federal agencies over computer systems

Musk and DOGE have clashed with congressionally-established federal agencies over access to computer systems and data.

*Reuters* reported on January 31 that "aides to Elon Musk" had locked some career civil servants out of computer systems at the Office of Personnel Management, the federal government's human resources department that maintains details on 2.2 million workers. [38] That same day, multiple sources reported that the Acting Secretary of the Treasury, David Lebryk, refused to grant DOGE access to a system that disburses $5.4 trillion in payments annually, including Social Security, government paychecks and contractor payments. The newly confirmed Treasury Secretary, Scott Bessent, granted DOGE access to the system later that day, and Lebryk resigned.[39][40][41] *The New York Times* described it as a possible attempt by Trump to "unilaterally restrict disbursement of money approved for specific purposes by Congress" following his earlier funding freeze. It also reported that DOGE had requested access to other technology systems at other agencies across the federal government.[34]

On February 1, members of DOGE gained access to classified information of the United States Agency for International Development (USAID) without sufficient security clearances. [42] DOGE personnel asked to be let into USAID headquarters and threatened to call the US Marshals,[33] which by law receive their direction from the Attorney General and the Director of the United States Marshals Service.[43][44] Two security chiefs at USAID attempted to deny DOGE access to the classified material, as they claimed they were "legally

*2 3*

obligated" to do; however, they were then placed on leave by the Trump administration.[42] The next day, Musk tweeted that USAID was a "criminal organization" and that it was "[t]ime for it to die".[33]

### Freezing of federal funds

Bloomberg News reported on February 2, 2025, that Musk had announced that DOGE was "shutting down" payments to Lutheran Family Services, a faith-based charity that provides social services to refugees, and other U.S. government contractors.[45]

# See also

- 18F, at the General Services Administration
- United Kingdom Government Digital Service

# References

1. Zakrzewski, Cat (December 5, 2018). "The government's tech unit is trying to reduce wait times for asylum seekers" (https://www.washingtonpost.com/news/powerpost/palom a/the-technology-202/2018/12/05/the-technology-202-the-government-s-tech-unit-is-tryin g-to-reduce-wait-times-for-asylum-seekers/). *The Washington Post*.
2. Lapowsky, Issie (March 14, 2019). "Kamala Harris Wants to Give States Millions to Overhaul Tech" (https://www.wired.com/story/kamala-harris-digital-services-act-2019/). *Wired*. ISSN 1059-1028 (https://search.worldcat.org/issn/1059-1028). Retrieved March 14, 2019.
3. "FACT SHEET: Improving and Simplifying Digital Service" (https://obamawhitehouse.arc hives.gov/the-press-office/2014/08/11/fact-sheet-improving-and-simplifying-digital-servic es). *The White House*. August 11, 2014. Retrieved April 19, 2015.
4. Scola, Nancy (August 11, 2014). "White House launches 'U.S. Digital Service,' with HealthCare.gov fixer at the helm" (https://www.washingtonpost.com/blogs/the-switch/wp/ 2014/08/11/white-house-launches-u-s-digital-service-with-healthcare-gov-fixer-at-the-hel m/). *The Washington Post*. Retrieved April 19, 2015.
5. Howard, Alex (August 13, 2014). "New US Digital Service Looks to Avoid IT Catastrophes" (https://web.archive.org/web/20140821065315/http://techpresident.com/n ews/25239/new-us-digital-service-looks-avoid-it-catastrophes). *TechPresident*. Archived from the original (http://techpresident.com/news/25239/new-us-digital-service-looks-avoi d-it-catastrophes) on August 21, 2014.
6. Shear, Michael D (August 11, 2014). "White House Picks Engineer From Google to Fix Sites" (https://www.nytimes.com/2014/08/12/us/politics/ex-google-engineer-to-lead-fix-it-t

## TEMPORARY AND TERM EMPLOYMENT AND APPOINTMENTS
## TABLE OF CONTENTS

| **Section** | **Page** |
|---|---|
| 1. Introduction | 6 |
| 2. References | 6 |
| 3. Responsibilities | 6 |
| 4. Term Employment | 7 |
|     a. Program Information | 7 |
|        Definition | 7 |
|        Four-Year Term Appointments | 7 |
|        Ten-Year STEM-related Term Appointments | 7 |
|        Appropriate use of Term Appointment | 8 |
|        Reduction-in-Force | 8 |
|        Categories of Term Appointments | 8 |
|        Trial Period | 8 |
|        Tenure | 8 |
|        Eligibility for Benefits | 8 |
|        Compensation | 9 |
|        Status | 9 |
|     b. Recruitment and Selection for Term Positions | 9 |
|        Request for Personnel Action (RPA) | 9 |
|        Vacancy Announcement | 9 |
|        Competitive Term Appointment | 10 |
|        Non-Competitive Term Appointment | 10 |
|        Restrictions | 10 |
| 5. Temporary Employment | 10 |
|     a. Program Information | 10 |
|        Definition | 10 |
|        Appropriate use of Temporary Appointment | 10 |
|        Time Frames | 10 |
|        Trial/Probationary Period | 11 |
|        Tenure | 11 |
|        Eligibility for Benefits | 11 |
|        Compensation | 12 |
|        Status | 12 |
|     b. Recruitment and Selection for Temporary Positions | 12 |
|        Request for Personnel Action, Standard Form 52 (RPA/SF-52) | 12 |
|        Vacancy Announcement | 13 |
|        Competitive Temporary Appointment | 13 |
|        Non-Competitive Temporary Appointment | 13 |
|        Restrictions | 13 |

25    4

# TEMPORARY AND TERM EMPLOYMENT AND APPOINTMENTS

1. <u>Introduction</u>.  GSA's Temporary and Term appointments are used in recruitment strategic planning as a strategy when the need for an employee's services is not permanent. Reasons for making such appointments include, but are not limited to:

   a.  Project work; extraordinary workload, scheduled abolishment, reorganization, contracting out of the function; uncertainty of future funding, or the need to maintain permanent positions for placement of employees who would otherwise be displaced from other parts of the organization; and temporary limited appointments to fill a short-term position (*i.e.,* one that is not expected to last longer than 1 year);

   b.  Meet an employment need that is scheduled to be terminated within a specific timeframe for such reasons as abolishment, reorganization, or contracting of the function; anticipated reduction in funding; or completion of a specific project or peak workload; or

   c.  Fill positions on a temporary basis when the positions are expected to be needed for placement of permanent employees who would otherwise be displaced from other parts of the organization.

2. <u>References</u>.

   - Title 5, CFR Part 316, Subpart C, Term Employment
   - Title 5, CFR Part 316, Subpart D, Temporary Limited Employment
   - Delegated Examining Handbook, June 2019

3. <u>Responsibilities</u>.

   a.  <u>Employees</u>. Employees are responsible for their own careers and must submit applications for vacancies to be considered for temporary and term employment opportunities.

   b.  <u>Managers/Supervisors</u>. Managers and supervisors are expected to comply with the rules governing the use of temporary and term appointments for short-term positions needed to meet mission requirements.

   c.  <u>Human Resources Service Centers (HRSCs)</u>. HRSCs will ensure all temporary and term appointments meet the eligibility criteria stipulated in Title 5, CFR Part 316, Subparts C and D, and provide consultation, as needed, to managers and supervisors.

   d.  <u>Office of Human Resources Management (OHRM)</u>. OHRM is responsible for the overall administration and management of GSA's Temporary and Term Employment.

4. <u>Term Employment</u>.

   a.  <u>Program Information</u>.

      (1) <u>Definition</u>. A **Term** appointment is a non-status appointment to a position in the competitive service, made for a specified period of time exceeding 1 year and lasting not more than 4 years. Term appointments are used to fill positions that are expected to last longer than 1 year, but which are clearly not continuing in nature and will terminate upon completion of the work.

      (2) <u>Four-Year Term Appointments</u>. Four-year term appointments under 5 CFR 316.301(a) are used to fill positions that are expected to last longer than 1 year, but not more than 4 years.

      (a) Individuals selected for a 4-year term employment with GSA will be given an initial appointment of up to 2 years. The initial appointment may be extended, in increments of time up to 1 year in length, up to the 4-year limit.

      (b) Exception: The Office of Personnel Management (OPM) may authorize exceptions to make and/or extend the 4-year limit. The employing office will initiate requests to extend appointments beyond the 4-year limit and forward the requests to the appropriate OPM service center. 5 CFR 316.301(b)

      (3) <u>Ten-Year STEM-related Term Appointments</u>. Ten-year term appointments under 5 CFR 316.301(c) are used to fill covered positions that are expected to last longer than 1 year, but not more than 10 years. Covered positions as described in OPM's Handbook of Occupational Groups and Series include:
- Social Science Series, 0101;
- Economist Series, 0110;
- Psychology Series, 0180;
- Natural Resources Management and Biological Sciences Group (i.e., 0400 group);
- Medical, Hospital, Dental, and Public Health Group (i.e., 0600 group);
- Engineering and Architecture Group (i.e., 0800 group);
- Physical Science Group (i.e.,1300 group);
- Mathematical Sciences Group (i.e., 1500 group); and
- Information Technology Group (i.e., 2200 group).

      (a) Individuals selected for a 10-year term employment with GSA will be given an initial appointment of up to 4 years. The initial appointment may be extended, in increments of time up to 2 years in length, up to the 10-year limit.

      (b) Appointments to a 10-year term may not last longer than 10 years from the date of the initial appointment.

      (c) Proposed selections of current or former political appointees for

27

STEM-related term appointments up to 10 years are subject to OPM pre-appointment review and approval.

(4) Appropriate Uses of Term Appointment. Examples of appropriate uses of term appointments include:

(a) To carry out special project work;

(b) To staff programs of limited duration; or

(c) To fill positions in activities undergoing a commercial activity review.

(5) Reduction-in-Force. Managers/supervisors responsible for hiring should estimate, as closely as possible, the continuing need for the term position when determining the time frames for extending term appointments to preclude the potential for reduction in force (RIF) procedures should the term appointment end prior to the expiration date of the appointment. RIF procedures are not required to separate term employees when their appointments expire. (See (8) below).

(6) Categories of Term Appointments. Appointments to a 4-year term and a 10-year term are two separate categories of term employment. For example, a 4-year term appointment may not be extended under the 10-year term employment appointment authority. Extensions for a 4-year term appointment must be approved by OPM as described in 4.a.(2)(b) above.

(7) Trial Period. The first year of employment of a term employee is a trial period and all term employees must serve a 1-year trial period. Prior Federal civilian service is credited toward completion of the required trial period in the same manner as prescribed by 5 CFR 315.802.  During this period, their employment can be terminated at any time, and they are entitled to the same limited protection and procedures provided to probationers by 5 CFR 315.804, 5 CFR 315.805 and 5 CFR 315.806.

(8) Tenure. Term employees are placed in Tenure group III and are covered by RIF procedures in the event RIF action is necessary if the appointment is terminated prior to the expiration of their term appointments. *RIF procedures are not used to separate term employees when their appointments expire.*

(9) Eligibility for Benefits. Term employees earn leave and are eligible to participate in the Federal Employees Health Benefits (FEHB) program, Federal Employees Group Life Insurance (FEGLI) Program, Federal Employee Retirement System (FERS) (under certain circumstances), the Thrift Savings Plan, and earn leave. Eligibility for the FEHB conveys eligibility to participate in Flexible Spending Accounts (FSA), Long-Term Care (LTC) insurance, and Federal Vision and Dental Programs (FEDVIP), whether or not the employee is enrolled in the FEHB. Comprehensive information on individual programs and eligibility requirements and restrictions can be

28

found on OPM's Insurance Programs website at
https://www.opm.gov/healthcare-insurance/

(10) <u>Compensation</u>. Term employees are eligible for within-grade increases in accordance with the provisions of 5 CFR 531, Subpart D and 5 CFR 532, Subpart D, and can be promoted, changed to lower grade, detailed,or reassigned to other positions within the time limits of their term appointments which management has determined appropriate for filling by term appointment.

(11) <u>Status</u>. Term employees do not acquire competitive status or reinstatement eligibility as a result of the term appointment. They may, however, be reappointed under their original term appointment. Combined service under the original appointment and the reappointment must not exceed the 4-year limit under 5 CFR §316.301(a), the maximum time allowed under 5 CFR §316.301(b), or the 10-year limit allowed under 5 CFR §316.301(c).

b. <u>Recruitment and Selection for Term Positions</u>.

(1) <u>Request for Personnel Action, Standard Form 52 (RPA/SF-52)</u>. When preparing the RPA/SF-52 action to recruit using a term appointment, the requesting office will provide the reason for using a term appointment, and the reason will be stated on the appointment Notification of Personnel Action, Standard Form 50.

(2) <u>Vacancy Announcement</u>. The vacancy announcement must clearly identify the time-limited nature of term employment and explain that the initial appointment may be extended up to the 4-year limit or 10-year limit (STEM-related), whichever applies. The following statement can be inserted into the vacancy announcement template as "Additional Information" concerning the position:

<u>4-Year Term Appointments</u>
"This is a term appointment, made for an initial period of up to 2 years. The appointment may be extended up to a total of 4 years, in increments of up to 1 year or less. Permanent competitive career or career-conditional employment cannot be acquired through a term appointment. Term employees are eligible to participate in most of the benefit programs available to permanent federal employees, e.g., the FEHB, FEGLI, Federal Employees Retirement System (FERS) and the Thrift Savings Plan (TSP)."

<u>10-Year STEM-related Term Appointments</u>
"This is a term appointment, made for an initial period of up to 4 years. The appointment may be extended up to a total of 10 years, in increments of up to 2 years or less. Permanent competitive career or career-conditional employment cannot be acquired through a term appointment. Term employees are eligible to participate in most of the benefit programs available to permanent federal employees, *e.g.*, the FEHB, FEGLI, Federal Employees Retirement System (FERS) and the Thrift Savings Plan (TSP)."

9

(3) <u>Competitive Term Appointment</u>. Competitive term appointments are made using procedures outlined in 5 CFR, Part 332, and in accordance with the Delegated Examining Handbook, June 2019.

(4) <u>Non-Competitive Term Appointment</u>. Non-competitive term appointments can be made in accordance with the provisions of 5 CFR 316.302(b)(1) – (8), to individuals eligible for appointment through, for example, reinstatement, Veterans Recruitment Appointment (formerly known as the Veterans Readjustment Appointment (VRA)), career or career-conditional appointment, and appointment of a veteran with a compensable service-connected disability of 30% or more.

(5) <u>Restrictions</u>.

(a)  Filling positions by term appointment is subject to the restriction that an outside applicant may not be hired for a term appointment in lieu of a qualified eligible on the agency's Reemployment Priority List (RPL).

(b)  Filing positions by term appointment is also subject to the provisions of 5 CFR 330, Subpart F (Agency Career Transition Assistance Plans (CTAP) for Local Surplus and Displaced Employees), and 5 CFR 330, Subpart G (Interagency Career Transition Assistance Plan (ICTAP) for Displaced Employees).

5. <u>Temporary Employment</u>.

  a. <u>Program Information</u>.

(1) <u>Definition</u>. A **Temporary** appointment is a non-status appointment to a competitive service position for a specified period of time not to exceed 1 year.

(2) <u>Appropriate Uses of Temporary Appointment</u>. Examples of the appropriate use of a temporary appointment include:

(a)  To fill a short-term position that is not expected to last longer than 1 year;

(b)  To meet an employment need that is scheduled to be terminated within a specified timeframe that is not longer than 1 year; or

(c)  To fill positions on a temporary basis when the positions are expected to be needed for placement of permanent employees who may otherwise be displaced from other parts of the organization when future staffing and funding levels have not yet been determined.

(3) <u>Time Frames</u>. Temporary appointments are made for a specified period of time not to exceed 1 year. However, the appointment may be extended for an additional

$30^{10}$

1 year, for a total of 24 months of total service in accordance with 5 CFR 316.401(c)(1) and (2).

(a)  Agencies may, subject to meeting the requirements of 5 CFR 316.401(d)(1), make and extend temporary appointments to positions involving intermittent or seasonal work without regard to the time limits requirements described in paragraph 3 above.

(b)  In addition, as provided by 5 CFR 316.401(d)(2), OPM may authorize exceptions to the time limit in paragraph 3 above "only when necessitated by major reorganizations or base closings or other unusual circumstances."  OHRM's Chief Human Capital Officer will initiate requests to extend appointments based on agency-wide circumstances (e.g., agency-wide reorganization or reduction in staffing levels), while the employing office will submit to OPM requests to extend temporary appointments to specific position or projects based on other unusual circumstances.

(4)  <u>Trial/Probationary Period</u>. Temporary employees do *not* serve a trial or probationary period and their employment can be terminated at any time upon notice from the agency. Such a termination action is not subject to RIF regulations.

(5)  <u>Tenure</u>. Temporary employees are placed in Tenure Group "0", and do not acquire competitive status or eligibility to be converted to a career or career-conditional appointment on the basis of the temporary appointment.

(6)  <u>Eligibility for Benefits</u>.

(a)  Temporary employees are *not* eligible to participate in the FEGLI Program, FERS, or TSP. However, they may be eligible to continue coverage under such benefit programs when the temporary appointment follows, without a break in service of more than 3 days, employment in a position that confers eligibility to participate in these programs and when certain other conditions are met.

(b)  Temporary employees are eligible to participate in the FEHB program if they are expected to work 130 hours per month or more for at least 90 days, and with full Government contribution and are not covered otherwise under the <u>Part-time Career Act</u>. GSA will determine whether or not the temporary employee is expected to meet the requirements for coverage and will offer coverage if they are in fact eligible to enroll. The total hours in pay status (including overtime hours) plus qualifying leave without pay hours must be expected to total at least 130 hours per month for the upcoming 90 days.

(c)  If the hours expected to work are 130 hours, but less than 90 days, then there is no eligibility for coverage. However, if the agency expectation changes and the temporary employee works 90 days or more, GSA will send notification and extend the opportunity to enroll in FEHB before the 91st day of employment.

(d)  If the temporary employee declines the first offer of coverage, they must meet the requirement to be expected to work 130 hours per month or more for at least 90 days to be eligible to enroll midyear under a Qualifying Life Event or during Open Season.

(e)  Temporary employees who are not expected to work 130 hours a month, will become eligible for FEHB coverage upon completion of one full year of current, continuous employment in the temporary position, with no break in service of 5 days or less. The FEHB coverage may be carried over when they move from covered positions to temporary appointments. However, temporary employees must pay both the employee and Government share of the premiums.

(f)  Temporary employees are covered by Social Security.

(g)  Temporary employees earn leave (except military leave) when appointed to a position with a regularly-scheduled tour of duty, either part time or full time.  All regularly scheduled temporary employees earn sick leave and those whose appointments are made for more than 90 days also earn annual leave.

(7)  Compensation. Temporary employees serving in General Schedule positions are not eligible for within-grade increases. Temporary employees serving in Federal Wage System positions are eligible for within-grade increases in accordance with 5 CFR 532, Subpart D.

(8)  Status. Temporary employees do not acquire competitive status or reinstatement eligibility as a result of the temporary appointment and are not eligible for promotion, reassignment, or transfer to other positions based on the temporary service. Such changes would be effected by a "Conversion to Appt, NTE ___" (NOA 515), if employees meet all qualifications and eligibility requirements of the new position and competitive procedures are used, as appropriate.

b.  Recruitment and Selection for Temporary Positions.

(1)  Request for Personnel Action, Standard Form 52 (RPA/SF-52). When preparing the RPA/SF-52 to recruit using a temporary appointment, the requesting office will provide the reason for using a temporary appointment. The reason for the temporary appointment will be stated on the appointment Notification of Personnel Action, Standard Form 50, using remarks from the Guide to Processing Personnel Actions M06 ("Reason for temporary appointment") and A21 ("Temporary employees serve under appointments limited to 1 year or less and are subject to termination at any time without use of adverse action or reduction-in-force procedures. A temporary appointment does not confer eligibility to be promoted or reassigned to other positions, or the ability to be non-competitively converted to career-conditional appointment.").

(2) <u>Vacancy Announcement</u>. The vacancy announcement must clearly identify the time limits of the temporary appointment and explain that the initial appointment may be extended for up to one additional year for a total of 24 months.

(3) <u>Competitive Temporary Appointment</u>. Competitive temporary appointments are made using procedures outlined in 5 CFR, Part 332, and in accordance with the Delegated Examining Handbook, June 2019.

(4) <u>Non-Competitive Temporary Appointment</u>. Non-competitive temporary appointments can be made in accordance with the provisions of 5 CFR 316.402(b)(1) – (8) to individuals eligible for appointment through, for example, reinstatement, Veterans Recruitment Appointment, career or career-conditional appointment, and appointment of a veteran with a compensable service-connected disability of 30% or more.

(5) <u>Restrictions</u>. Temporary positions of more than 120 days must be cleared for CTAP and ICTAP eligibles.

## Appendix A:   Temporary and Term Employment and Appointments At-A-Glance

| Temporary Appointments<br>*Regulatory Reference: 5 CFR 316 Subpart D* | Term Appointments<br>*Regulatory Reference: 5 CFR 316 Subpart C* |
|---|---|
| **Duration of Appointment**<br><br>• Appointments are made for up to 1-year and may be extended for up to 1 additional year (24 months of total service).<br>• Position cannot be filled for more than 24 months within the preceding 3-year period.<br>• Cannot be filled with a successor position (i.e., a position that replaces and absorbs the original position that has the same basic duties). The selecting official must certify in writing to this condition prior to the position being staffed.<br>• OPM can approve an extension beyond the 2-year period with appropriate justification but this occurs very rarely. | **Duration of Appointment**<br><br>• 4-year term appointments are made for up to 2 years and can be extended up to 4 years total.<br>• 10-year STEM-related term appointments are made for up to 4 years and can be extended up to 10 years total.<br>• Only OPM can approve an extension of a term appointment beyond the 4-year limit.<br>• 10-year term appointments cannot be extended beyond the maximum allowed. |
| **Other Information**<br><br>• Does not confer competitive status, i.e., there is no authority to noncompetitively convert an individual to a permanent appointment.<br>• Does not give an individual reinstatement rights.<br>• Ineligible for transfer to other agencies.<br>• May not be promoted or reassigned to another position.<br>• Ineligible for within-grade increase (except for wage grade positions). | **Other Information**<br><br>• Does not confer competitive status, i.e., there is no authority to noncompetitively convert an individual to a permanent appointment.<br>• Ineligible for transfer to other agencies.<br>• Does not give an individual reinstatement rights.<br>• May be promoted, demoted, or reassigned to another position within the existing term project that has been authorized to fill by term appointment (the 4-year/10-year count does not start over).<br>• Eligible for within-grade increases. |
| **Appropriate Uses**<br><br>• Fill a short-term position that is not expected to last more than a year.<br>• Meet an employment need that is scheduled to be terminated within 1 or 2 years for reasons such as reorganization, abolishment, or the completion of a specific project.<br>• Workload peak.<br>• Fill positions that involve intermittent or seasonal (recurring annually) work schedules.<br><br>**Inappropriate Uses**<br><br>• Hiring temporary employees to avoid the costs of employee benefits.<br>• Using temporary employment as a "tryout" period. | **Appropriate Uses**<br><br>• Project work.<br>• Extraordinary workload.<br>• Scheduled abolishment of a position.<br>• Reorganization.<br>• Uncertainty of future funding.<br>• Contracting out of the function.<br><br>**Inappropriate Uses**<br><br>• Using term employment as a "tryout" period prior to permanent appointment.<br>• Circumventing the competitive examining process by appointing an individual on a term |

14

*34*

| • Circumventing the competitive examining process by appointing an individual on a temporary basis because that individual is not within reach for permanent appointment. | basis because that individual is not within reach for permanent appointment. |
|---|---|
| **Temporary Appointments**<br>Regulatory Reference: 5 CFR 316 Subpart D | **Term Appointments**<br>Regulatory Reference: 5 CFR 316 Subpart C |
| **Competition Requirements**<br><br>• Temporary and term appointments are filled using competitive procedures, i.e., a vacancy announcement is posted on USAJOBS and individuals must apply in order to receive consideration. Veterans' preference rules apply in the referral and selection process.<br><br>• Noncompetitive temporary and term appointments may be made when an individual meets the eligibility requirements of an appropriate appointing authority, e.g., reinstatement, Veterans Recruitment Appointment, 30% or more compensable disabled veteran, former ACTION volunteers, certain former oversees employees, certain military spouses, etc. In some situations, a vacancy announcement will still be required in order to ensure there are no displaced or surplus employees with special selection priority under the Career Transition Assistance Plan or the Interagency Career Transition Assistance Plan. | |
| **Eligibility Requirements**<br><br>• Must meet the OPM established qualification standards for the position.<br>• Medical standards apply when required by the position being filled.<br>• Suitability standards must be met. | |
| **Trial Period**<br><br>None | **Trial Period**<br><br>Term appointees serve a 1-year trial period |
| **Tenure**<br><br>Placed in tenure group 0 – individuals have no reduction-in-force rights; appointment may be terminated at any time. | **Tenure**<br><br>Placed in tenure group III. Individuals may be separated for performance, conduct, and suitability issues during the first year and at the expiration of the appointment without adverse action procedures. If separating for lack of funds, lack of work, etc., reduction-in-force procedures apply and employees are afforded their appropriate rights. |
| **Benefits**<br><br>• Ineligible for life insurance and retirement but covered under social security (FICA).<br>• Eligible for health benefits if employees are anticipated to work at least 130 hours per month for three consecutive months.<br>• Earns annual and sick leave when working a full- or part-time work schedule and the appointment is for at least 90 days or more. | **Benefits**<br><br>• Eligible for health benefits and life insurance coverage if working a full- or part-time work schedule.<br>• Eligible for retirement.<br>• Earns annual and sick leave when working a full- or part-time work schedule. |

35    15



An official website of the United States government

# U.S. General Services Administration

# Temporary and Term Employment and Appointments

████mber: 9316.1A HRM
**Status:** Active
**Signature Date:**
02/05/2024
**Expiration Date:**
02/28/2027

[Full Directive PDF](#)

**Printer Friendly Format**

Problems viewing this page?
[directives@gsa.gov](mailto:directives@gsa.gov)

Are you a GSA employee? Use the
[Directive Library on InSite](#)
to access referenced information.

## 1. Purpose.

This Order establishes the General Services Administration (GSA) policy governing the use of temporary and term appointments to meet employment needs of the agency that are not of a permanent nature.

## 2. Background.

The Code of Federal Regulations, 5 CFR §316, Subpart C, Term Employment, and Subpart D, Temporary Limited Employment, provide the framework within which Federal agencies can make Temporary and Term appointments. For example, agencies may make time-limited appointments in order to accomplish project work, to accommodate extraordinary workload, or to continue functions when future funding is not certain. This Order explains the proper use of temporary and term appointments and the procedures to be followed in making such appointments. Term and temporary employees are used to supplement the permanent civil service workforce.

## 3. Scope and Applicability.

a. In filling temporary and term vacancies to fill short term positions.

 i. GSA may make a temporary time-limited appointment to fill a short-term position to meet an employment need that is scheduled to be terminated (i.e., one that is not expected to last for a specified period not to exceed 1 year). The appointment may be extended up to a maximum of 1 additional year (24 months of total service). GSA may not fill a position by temporary appointment if that position has previously been filled by temporary appointment(s) for an aggregate of 2 years, or 24

months, within the preceding 3-year period.

    ii. GSA may make a term appointment for a period of more than 1 year but not more than 4 years to positions where the need for an employee's services is not permanent. GSA may also make a term appointment for certain Science, Technology, Engineering, and Mathematics-related (STEM-related) occupations for a period of more than 1 year but not more than 10 years when the need for work is not permanent. For all term appointments, the first year of service of a term employee is a trial period regardless of the method of appointment. Prior Federal civilian service is credited toward completion of the required trial period in the same manner as prescribed by 5 CFR 315.802, and a term employee may be terminated at any time during the trial period.

b. The Office of Inspector General (OIG) has independent personnel authority. The Inspector General Act of 1978, as amended, 5 U.S.C. App. 3, § 6(a)(7) (Inspector General is authorized to select, appoint, and employ such officers and employees as may be necessary for carrying out the functions, powers, and duties of the Office of the Inspector General); GSA Order, ADM 5450.39D CHGE 1, GSA Delegations of Authority Manual (Delegations Manual), Chapter 2, Part 1 ("the Inspector General has independent authority to formulate policies and make determinations concerning human capital issues within the Office of Inspector General;" determinations in the Delegations Manual do not limit that authority). Similarly, the agency recognizes that the Inspector General has independent authority to formulate policies and make determinations concerning training, employee development, and career management.

c. This Order applies to the Civilian Board of Contract Appeals (CBCA) only to the extent that the CBCA determines it is consistent with the CBCA's independent authority under the Contract Disputes Act and it does not conflict with other CBCA policies or the CBCA mission.

**4. Cancellation.**

This directive cancels and supersedes HRM 9316.1 CHGE 1, Temporary and Term Employment and Appointments, dated March 15, 2021.

**5. Explanation of Changes.**

    a. Amended section 3(a)(2) to reference the 10-year STEM-related appointing authority.

    b. Added section 4(a)(3) which describes the 10-year STEM-related appointment authority.

    c. Added section 4(a)(6), Categories of Term Appointments.

    d. Amended section 4(a)(7) to add "Prior Federal civilian service is credited toward completion of the required trial period in the same manner as prescribed by 5 CFR 315.802."

37

e. Amended section 4(a)(11) to add "... or the 10-year limit allowed under 5 CFR 316.301(c)."

f. Amended section 4(b)(2) to distinguish vacancy announcement language for 4-year and 10-year STEM-related term appointments.

g. Added information to Appendix A, Term Appointments column, Duration of Appointment section to address the time limits for 10-year STEM-related term appointments.

h. Added information to Appendix A, Term Appointments column, Other Information section to address timeframes for 4-year and 10-year term appointments.

i. Other minor formatting and grammatical changes and edits.

Last updated: Mar 15, 2024　　　　　.

38

# CONGRESS.GOV

---

# All Information (Except Text) for H.R.10177 - DOGE Act

118th Congress (2023-2024)

**« Back to this bill**

|  |  |
|---|---|
| **Sponsor:** | Rep. Bice, Stephanie I. [R-OK-5] (Introduced 11/20/2024) |
| **Committees:** | House - Oversight and Accountability |
| **Latest Action:** | House - 11/20/2024 Referred to the House Committee on Oversight and Accountability.  (All Actions) |
| **Tracker:** ❶ | ▮▮▮▮▮▮▮ |

---

There is 1 version of this bill. View text »

Click the check-box to add or remove the section, click the text link to scroll to that section.
☑ Titles ☑ Actions Overview ☑ All Actions ☑ Cosponsors ☑ Committees ☑ Related Bills ☑ Subjects ☑
Latest Summary ☐ All Summaries

## Titles (3)

### Short Titles

**Short Titles - House of Representatives**

**Short Title(s) as Introduced**
DOGE Act
Decreasing Overlapping Grants Efficiently Act

### Official Titles

**Official Titles - House of Representatives**

**Official Title as Introduced**
To prohibit the award of Federal grants to applicants
submitting duplicative or fraudulent applications, to
require the Director of Office of Management and
Budget to establish a tracking and deconfliction system
for Federal grant applications, and for other purposes.

## Actions Overview (1)

| Date | Actions Overview |
|------|------------------|
| 11/20/2024 | Introduced in House |

## All Actions (2)

| Date | All Actions |
|------|-------------|
| 11/20/2024 | Referred to the House Committee on Oversight and Accountability. Action By: House of Representatives |
| 11/20/2024 | Introduced in House Action By: House of Representatives |

## Cosponsors (5)

| Cosponsor | Date Cosponsored |
|-----------|------------------|
| Rep. Moore, Blake D. [R-UT-1]* | 11/20/2024 |
| Rep. Bean, Aaron [R-FL-4]* | 11/20/2024 |
| Rep. Self, Keith [R-TX-3] | 12/03/2024 |
| Rep. Weber, Randy K. Sr. [R-TX-14] | 12/03/2024 |
| Rep. Davidson, Warren [R-OH-8] | 12/03/2024 |

## Committees (1)

Committees, subcommittees and links to reports associated with this bill are listed here, as well as the nature and date of committee activity and Congressional report number.

| Committee / Subcommittee | Date | Activity | Related Documents |
|--------------------------|------|----------|-------------------|
| House Oversight and Accountability | 11/20/2024 | Referred To | |

## Related Bills (0)

## Subjects (1)

**Subject — Policy Area:**

Government Operations and Politics

One Policy Area term, which best describes an entire measure, is assigned to every public bill or resolution.

## Latest Summary (0)

January 20, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Purpose.  This Executive Order establishes the Department of Government Efficiency to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity.

Sec. 2.  Definitions.  As used in this order:

(a)  "Agency" has the meaning given to it in section 551 of title 5, United States Code, except that such term does not include the Executive Office of the President or any components thereof.

(b)  "Agency Head" means the highest-ranking official of an agency, such as the Secretary, Administrator, Chairman, or Director, unless otherwise specified in this order.

Sec. 3.  DOGE Structure.  (a)  *Reorganization and Renaming of the United States Digital Service.*  The United States Digital Service is hereby publicly renamed as the United States DOGE Service (USDS) and shall be established in the Executive Office of the President.

(b)  *Establishment of a Temporary Organization*.  There shall be a USDS Administrator established in the Executive Office of the President who shall report to the White House Chief of Staff. There is further established within USDS, in accordance with section 3161 of title 5,

41

United States Code, a temporary organization known as "the U.S. DOGE Service Temporary Organization". The U.S. DOGE Service Temporary Organization shall be headed by the USDS Administrator and shall be dedicated to advancing the President's 18-month DOGE agenda. The U.S. DOGE Service Temporary Organization shall terminate on July 4, 2026. The termination of the U.S. DOGE Service Temporary Organization shall not be interpreted to imply the termination, attenuation, or amendment of any other authority or provision of this order.

(c) *DOGE Teams*. In consultation with USDS, each Agency Head shall establish within their respective Agencies a DOGE Team of at least four employees, which may include Special Government Employees, hired or assigned within thirty days of the date of this Order. Agency Heads shall select the DOGE Team members in consultation with the USDS Administrator. Each DOGE Team will typically include one DOGE Team Lead, one engineer, one human resources specialist, and one attorney. Agency Heads shall ensure that DOGE Team Leads coordinate their work with USDS and advise their respective Agency Heads on implementing the President 's DOGE Agenda.

Sec. 4. *Modernizing Federal Technology and Software to Maximize Efficiency and Productivity*. (a) The USDS Administrator shall commence a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems. Among other things, the USDS Administrator shall work with Agency Heads to promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization.

42

(b)  Agency Heads shall take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems.  USDS shall adhere to rigorous data protection standards.

(c)  This Executive Order displaces all prior executive orders and regulations, insofar as they are subject to direct presidential amendment, that might serve as a barrier to providing USDS access to agency records and systems as described above.

Sec. 5.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,

   January 20, 2025.

43

# Congress of the United States
## Washington, DC 20515

January 27, 2025

Acting Director Matthew J. Vaeth
Office of Management and Budget
1650 17th Street NW
Washington, DC 20006

Dear Acting Director Vaeth:

As leaders of the House and Senate Committees on Appropriations, we write with extreme alarm about the Administration's efforts to undermine Congress's power of the purse, threaten our national security, and deny resources for states, localities, American families, and businesses. The President has issued a number of Executive Orders to unilaterally freeze or contravene critical funding provided in bipartisan laws, sowing chaos across states, families, and communities. In that vein, you have now issued a series of Office of Management and Budget (OMB) memoranda that only further disarray and inefficiency—in particular, M-25-13, pursuant to which agencies will be ordered to stop vast swaths of federal financial assistance to states, families, and communities as of 5:00 PM ET on Tuesday, January 28. The scope of what you are ordering is breathtaking, unprecedented, and will have devastating consequences across the country. We write today to urge you in the strongest possible terms to uphold the law and the Constitution and ensure all federal resources are delivered in accordance with the law.

In the 116th Congress, then-OMB Director Russ Vought oversaw unlawful and unprecedented actions at OMB that contravened appropriations laws. In the years since, our committees remained laser-focused on preventing such abuse, without regard to whether the President was a Republican or a Democrat, and enacted reforms to increase transparency and reporting to Congress on apportionments and impoundment to protect Congress's institutional interests. Among other requirements, Congress now requires the publication of every apportionment not later than two business days after approval, the publication of any changes in the delegation of apportionment authority in the Federal Register with an explanation of the reasons for any changes to Congress, and reporting by the executive branch of any violations of the Impoundment Control Act of 1974 to Congress, with a copy sent to the Comptroller General. Agencies are also required to notify our committees of any further abuses that would hinder their ability to carry out duly enacted funding laws.

During that same time, Mr. Vought's Center for Renewing America began espousing unfounded theories that the President has an "inherent constitutional power to impound"—a theory long-disavowed by the Department of Justice's Office of Legal Counsel, the Government Accountability Office, and the Supreme Court of the United States. Based on his work at the Center for Renewing America and testimony this month before the Senate Committees on the Budget and Homeland Security and Governmental Affairs, it is clear Mr. Vought feels emboldened to defy Congress, the Constitution, and the Impoundment Control Act.

The President's Executive Orders issued last week appear to be guided by the same philosophy, calling for unlawful actions across the executive branch to halt national security programs, State and local infrastructure projects, and critical programs that lower the cost of living for American families, among numerous other requirements in law.

44

The memoranda you have issued to effectuate those orders demonstrate a similar commitment to this misguided philosophy. These memoranda, particularly M-25-13, together with the Executive Orders, have sown immense confusion across the country, with some reports indicating that they could immediately halt all federal funding for any grant or loan. This Administration's actions will have far-reaching consequences for nearly all federal programs and activities, putting the financial security of our families, our national security, and the success of our country at risk.

While we may have strong policy disagreements, we should all be united in upholding our nation's laws and the Constitution. We will be relentless in our work with members on both sides of the aisle and in both chambers to protect Congress's power of the purse. The law is the law—and we demand you in your role as Acting OMB Director reverse course to ensure requirements enacted into law are faithfully met and the nation's spending laws are implemented as intended.

Sincerely,

Rosa L. DeLauro
Ranking Member
Committee on Appropriations
U.S. House of Representatives

Patty Murray
Vice Chair
Committee on Appropriations
United States Senate

45